AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Ten (10) Seagate Hard Drives that are stored at<br>premises controlled by the FBI, as more fully<br>described in Attachment A | )<br>)<br>)<br>)<br>)<br>) Case No.    MJ24-593 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Ten (10) Seagate Hard Drives that are stored at premises controlled by the FBI, as more fully described in Attachment A, incorporated herein by reference

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § § 1343, 1349, and 1956(h) | Wire Fraud, Conspiracy to Commit Wire Fraud, and Conspiracy to Commit Money Laundering |

The application is based on these facts:

☑ See Affidavit of FBI Agent Andrew Cropcho, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Andrew Cropcho, FBI Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:    09/19/2024

_____
*Judge's signature*

City and state:  Seattle, Washington

Brian A. Tsuchida, U.S. Magistrate Judge
*Printed name and title*

USAO No. 2019R01037

# AFFIDAVIT

STATE OF WASHINGTON      )
                         )      ss
COUNTY OF KING           )

I, Andrew Cropcho, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since May of 2018. I am currently assigned to the Seattle Field Office. My primary duties include investigating violations of federal law, including corporate fraud, securities fraud, government program fraud, and healthcare fraud. My duties include investigating instances of wire fraud being used for financial gain at the expense of others. Before my career as an FBI Special Agent I was employed by a large public accounting firm for over three years and, as part of my employment, I examined financial information of clients to determine their accuracy, reliability, and sources.

2.     The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement personnel; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein including, but not limited to, the victims in this investigation; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

3.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1349

Affidavit of Special Agent Andrew Cropcho-1
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  (Conspiracy to Commit Wire Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C.

2  1956(h) (Conspiracy to Commit Money Laundering), have been committed by Estonian

3  nationals Sergei Potapenko ("Potapenko") and Ivan Turõgin, also known as Ivan

4  Turygin, ("Turõgin") (collectively, "the defendants").

5  **PROCEDURAL AND OPERATIONAL HISTORY**

6      4.      On October 27, 2022, a grand jury sitting in the Western District of

7  Washington charged Potapenko and Turõgin in an eighteen-count indictment, charging

8  each defendant with one count of Conspiracy to Commit Wire Fraud, in violation of 18

9  U.S.C. § 1349; sixteen counts of Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2;

10  and one count of Conspiracy to Commit Money Laundering, in violation of 18

11  U.S.C. § 1956(h). The case is captioned *United States v. Potapenko, et. al*., CR22-185

12  RSL.

13      5.      Following the indictment, the Department of Justice submitted to Estonian

14  authorities a First Supplemental Request for Assistance, dated November 4, 2022, and a

15  Second Supplemental Request for Assistance, dated November 8, 2022 (collectively, "the

16  Estonian MLATs"), pursuant to the 1998 U.S.-Estonia Mutual Legal Assistance Treaty.

17      6.      Among other things, the Estonian MLATs asked the relevant authorities in

18  Estonia to conduct searches, in accordance with Estonian law, of the following locations

19  for evidence relating to the defendants' crimes:

20          a.   Turõgin's residence located at Kuusenõmme tee 19, Pirita linnaosa,

21               Tallinn, Estonia;

22          b.   Potapenko's Residence located at Järvemetsa tee 5, Peetri, Estonia;

23          c.   The residence of Tatjana Potapova, defendants' CFO located at

24               Rahu 18, Loksa, Estonia;

25  //

26  //

27

Affidavit of Special Agent Andrew Cropcho-2
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

     d.  The offices of various entities owned or affiliated with the defendants located at Tartu mnt 43, Tallinn, Estonia, and Tartu mnt 83, Tallinn, Estonia;

     e.  Property leased by Burfa Media OÜ located at Varvi tn 5 (Laki tn 12), Tallinn, Estonia;

     f.  Property leased by Burfa Tech OÜ located at Narva Technology Park, Elektrijaama tee 59, Narva, Estonia; and

     g.  Safe deposit box #912, belonging to Tatjana Potapova located at Swedbank in Tallinn, Estonia.

7.     From November 20, 2022 through November 22, 2022, Estonian law enforcement conducted searches of the above-referenced locations (the "Estonian Searches"). At least one person representing the FBI was present at each location. Potapenko and Turõgin were also arrested on November 20, 2022, based on requests for provisional arrests that were transmitted by U.S. authorities to the Estonian authorities. Potapenko and Turõgin subsequently were released on bond pending the completion of extradition proceedings.

8.     On May 28, 2024, after the Supreme Court of Estonia ruled that Potapenko and Turõgin could be extradited to the United States of America, they were arrested again in Estonia, and thereafter escorted by the FBI from Tallinn, Estonia, to Seattle, Washington on May 29, 2024.

9.     Between January 2023 and September 2024, Estonian authorities transferred to custody of the FBI some of the material seized in response to the Estonian MLATs. The material provided included ten Seagate hard drives that included forensic copies, prepared by Estonian law enforcement, of 143 digital devices seized by Estonian authorities during the Estonian Searches of Potapenko's, Turõgin's, and Potapova's residences, and three of the business locations, namely, Tartu mnt 83, Tallinn, Varvi tn 5

1  (Laki tn 12), Tallinn, and Narva Technology Park, Elektrijaama tee 59, Narva. An index

2  listing the 143 devices the images of which are included on the ten Seagate hard drives is

3  labelled Appendix 1 to Attachment A to this Affidavit, and is incorporated herein by

4  reference.

## PURPOSE OF AFFIDAVIT

6       10.    This Affidavit is being submitted pursuant to Federal Rule of Criminal

7  Procedure 41 in support of an Application for a warrant authorizing the search of the

8  contents of the ten Seagate hard drives, containing forensic copies of digital devices

9  seized during the Estonian Searches that took place from November 20, 2022, through

10  November 22, 2022, and which are now in the custody of the FBI in Seattle, Washington,

11  further described in Attachment A to this Affidavit.

## STATEMENT OF PROBABLE CAUSE

13       11.    The FBI investigation has revealed that, starting in 2013 and continuing

14  through the present, Potapenko and Turõgin (together, the "defendants"), as well as

15  various corporate entities they owned and/or controlled, and other co-conspirators,

16  engaged in a multi-faceted fraud and money-laundering conspiracy. The defendants

17  persuaded investors to invest hundreds of millions of dollars in defendants'

18  cryptocurrency-related businesses by making false and fraudulent representations,

19  pretenses and promises about those businesses. The defendants then used shell companies

20  and other vehicles to funnel the fraud proceeds to themselves and other companies under

21  their control. This conduct violated United States criminal laws, including Title 18,

22  United States Code, Sections 1349 (Conspiracy to Commit Wire Fraud), 1343 (Wire

23  Fraud), and 1956(h) (Conspiracy to Commit Money Laundering).

## BACKGROUND REGARDING CRYPTOCURRENCY MINING

25       12.    I am familiar with matters related to cryptocurrency (also known as virtual

26  currency) and cryptocurrency mining. Cryptocurrency is a type of digital asset. Unlike

27

Affidavit of Special Agent Andrew Cropcho-4
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

traditional currency (which is sometimes called "fiat currency"), cryptocurrency is not issued by any government or bank. Rather, users generate and exchange cryptocurrency using computers operating on decentralized, peer-to-peer networks. There are thousands of virtual currencies in use. Bitcoin is the most popular form of cryptocurrency.

13.     Cryptocurrency mining is the process of using computers to generate new cryptocurrency for profit. Computers mine currency by performing operations that validate transactions and maintain the security of the cryptocurrency network. These verified transactions make up a decentralized, unchangeable ledger of cryptocurrency transactions called the "blockchain." Cryptocurrency miners receive newly-created currency as a reward for using their computer power to complete the operations.

14.     Cryptocurrency mining operations require substantial computer processing power. The greater a mining operation's processing power, the more cryptocurrency it can be expected to produce. Processing power is measured by "hashrate," which reflects the number of calculations that the computer can perform per second.

15.     "Cloud mining" or "remote mining" is an economic arrangement in which participants can, in essence, rent a specified amount of hashrate from a mining operation for an agreed period of time (the contract period). During the contract period, the participant is entitled to receive a portion of the cryptocurrency generated by the mining operation. The participant's share of the mining proceeds is based on the amount of hashrate purchased.

## EVIDENCE OF THE CHARGED OFFENSES

### A. Summary of the Investigation

16.     As discussed below, my investigation has established that, from approximately 2013 through present day, Turõgin, Potapenko, and their co-conspirators deceived and defrauded others in relation to cryptocurrency and cryptocurrency-related ventures for their own personal gain. They further engaged in a series of financial

Affidavit of Special Agent Andrew Cropcho-5
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

transactions to obfuscate the true nature and location of the fraudulently obtained funds, and to enrich themselves.

17.     This fraud scheme had four distinct stages, which together constitute a scheme or artifice to defraud:

*a.  Sale of Physical Cryptocurrency Mining Hardware and Equipment:* Beginning in 2013, through their company "HashCoins," Turõgin and Potapenko sold cryptocurrency mining hardware and equipment they did not have and could not reasonably expect to procure as promised. After selling equipment they could not deliver, Turõgin and Potapenko converted the customers' orders into contractual rights to participate in a purported cloud mining operation called HashFlare, which Turõgin and Potapenko also owned and operated.

*b.  Sale of Cryptocurrency Mining Contracts:* Between about 2015 and 2019, Turõgin, Potapenko, and other co-conspirators operated HashFlare as a fraud and Ponzi scheme. During this time, they fraudulently induced hundreds of thousands of individuals to invest in contracts that guaranteed the buyer a portion of HashFlare's purported cryptocurrency mining power, and thus a portion of the mined cryptocurrency. Turõgin and Potapenko sold over $575 million worth of mining contracts, but HashFlare did not have anywhere near the mining capacity needed to perform those contracts. When customers demanded that defendants distribute their portions of the mined currency, defendants paid the customers using cryptocurrency they had purchased on the open market rather than currency that had been mined by HashFlare as represented. In July 2018, HashFlare canceled a majority of its contracts with investors.

*c.  Polybius Initial Coin Offering:* In 2017, Turõgin and Potapenko launched an investment offering known as an Initial Coin Offering ("ICO"). Defendants represented that the proceeds of the ICO would be used to develop a digital bank, and further, that a portion of the bank's proceeds would be distributed to investors.

Affidavit of Special Agent Andrew Cropcho-6
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Defendants raised over $25 million in the ICO. However, defendants never formed a

2  bank, never paid any distributions to investors, and instead transferred a large portion of

3  the investment proceeds to shell companies, bank accounts, and cryptocurrency wallets

4  they controlled.

5       ***d. Laundering Proceeds:*** To dissipate and conceal the fraud proceeds,

6  defendants funneled the fraudulently obtained victim funds through a convoluted network

7  of domestic and international shell companies, bank accounts, cryptocurrency exchanges,

8  cryptocurrency wallets, and tangible property under their control. Turõgin and Potapenko

9  used fraud proceeds to fund their lavish lifestyles, including travel on private jets, stays at

10  luxurious international villas, and the purchase of real estate, designer jewelry, and

11  luxury cars in Estonia. After shuttering HashFlare, Turõgin and Potapenko used fraud

12  proceeds to purchase expensive cryptocurrency mining hardware, which they used to

13  mine cryptocurrencies for personal gain.

14  **B. HashFlare & HashCoins**

15       **a. Incorporation and Ownership**

16       18.    I have investigated the formation of numerous businesses controlled by the

17  defendants. My investigation has revealed that the defendants owned or controlled the

18  following business entities over the period charged in the Indictment: Burfa Media OÜ,

19  Burfa Capital OÜ (aka Starfix OÜ), Burfa Tech OÜ (aka HashCoins OÜ), Dalmeron

20  Projects LP, Polybius Foundation OÜ (aka Polybius Foundation SE, or Polybius

21  Foundation AS), HashFlare LP (aka HashCoins LP, or Fast Consult LP), Advendor OÜ,

22  Polybius Fintech MidCo OÜ, Polybius Tech OÜ, Apico OÜ, Felmaway OÜ, and

23  Ecohouse Networks OÜ. My investigation has established that each of these entities was

24  used to perpetrate the crimes charges in the indictment, or received proceeds derived

25  from those crimes.

26  //

27

Affidavit of Special Agent Andrew Cropcho-7
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

19.    HashFlare maintained the website "hashflare.io." HashCoins maintained the website "HashCoins.com." According to HashCoins' and HashFlare's websites, Potapenko is a co-founder and CEO of the entities. According to public reporting, Turõgin was a co-founder and Business Development Chairman of HashCoins. Turõgin has also been identified as a co-founder of HashFlare in public reporting.

20.    Three of defendants' companies—Burfa Capital, Burfa Media, and Burfa Tech—are collectively referred to as the "Burfa Entities" in this Affidavit. Burfa Capital is a holding company for many of Turõgin's and Potapenko's other companies. Burfa Media purportedly provided mining capacity that was supposedly consumed by HashFlare. In May 2019, HashCoins was re-named "Burfa Tech" in the Estonian Business Registry.

### b. HashCoins Business Operations

21.    I have reviewed records showing that, beginning in 2014, HashCoins advertised the sale of what it characterized as proprietary cryptocurrency mining hardware. HashCoins' website described HashCoins as a "manufacturer of bitcoin mining hardware." HashCoins' promotional material stated that the company had "produced thousands of devices" for cryptocurrency mining. However, I determined that HashCoins had no manufacturing capacity. I observed e-mail communications between the defendants and third parties, in which they attempted to purchase the main components that compose bitcoin mining rigs instead of manufacturing the components themselves. Instead, HashCoins purchased mining equipment from other manufacturers, placed HashCoins branding on the equipment, and resold it. HashCoins required up-front payment in full for all purchases of mining equipment. These facts were corroborated by a former employee during an interview with Estonian law enforcement, in which the employee said that HashCoins named mining equipment, but did not produce it.

//

22.     Based on my investigation, by January 2015 at the latest, HashCoins had sold and continued to sell far more equipment than it had the capacity to acquire. An internal HashCoins business record reflects that, as of December 2014, HashCoins had delivered the promised equipment for only 14.5% of its orders. Emails obtained by the FBI show that, for most of 2015, HashCoins advised its customers of serial delays in the delivery of cryptocurrency mining equipment. Some customers who purchased thousands or tens of thousands of dollars' worth of mining equipment in 2014 still had not received their orders by late 2015 or early 2016. Yet, despite these unresolved and ongoing delays, for much of 2015 HashCoins continued to sell mining equipment it did not have and could not build or acquire.

### c.  HashFlare Business Operations

23.     ***HashFlare's Cloud Mining Service:*** HashCoins' Terms of Service provided that, if HashCoins was unable to deliver physical equipment as promised, the company reserved the right to "offer the Customer compensation of equal or greater value in [the] form of virtual hardware and/or remote mining." By May 2015, Turõgin, Potapenko, and other co-conspirators invoked this provision to convert unfulfilled HashCoins contracts for the purchase and sale of physical cryptocurrency mining equipment into contractual rights to a share of HashCoins's virtual mining service, which defendants called "HashFlare."

24.     By April 2015, defendants also began marketing HashFlare's purported cloud mining services to the general public. HashFlare advertised the following on its website: "Our service makes cryptocurrency mining available to every user. You no longer need to buy expensive equipment and spend your time setting up miners. Just select your desired capacity and earn income!" On another portion of its website, HashFlare advertised that "Cloud mining offers a unique option for mining with a low cost of entry as well as minimal risk and expense, which is opposite to traditional models

1  of mining that involve procurement, maintenance and configuration of highly specialized
2  software."

3      25.    HashFlare's mining contracts purported to, in essence, rent out a portion of
4  the computing power of HashFlare's supposedly vast mining network. On its website,
5  HashFlare explained that a user could "purchas[e] part of the mining power of hardware
6  hosted and owned by a Cloud Mining services provider," which "configur[es] the
7  hardware, maintain[s] uptime and select[s] the most efficient and reliable [mining]
8  pools." The website stated that a customer's "mining starts immediately after confirmed
9  payment"; that the customer could "view all mining related information in real-time"; and
10 that a customer could "instantly" withdraw mined currency. For example, on April 18,
11 2015, for $9.95, a user could buy one million hashrate ("one million hash per second" or
12 "1 MH/s") from HashFlare. For this rate, HashFlare advertised a "100% Scrypt Miner,"
13 automatic accruals in Bitcoin, and a daily maintenance fee of $0.01 per 1/MH/s.

14     26.    HashFlare's website also offered a dashboard that allowed investors to
15 access their account information. The account information included, among other things,
16 a balance ledger that showed the amount of cryptocurrency the user purportedly had
17 generated through the user's mining activity on HashFlare. The ledger also reflected
18 deductions from the balance for "maintenance fees" incurred by the user. The user would
19 then have the option to automatically reinvest the balance in additional mining activity or,
20 alternatively, to withdraw the balance provided that it exceeded a minimum threshold,
21 which generally fluctuated between 0.01 bitcoin to 0.05 bitcoin.

22     27.    In addition to purportedly earning funds through cloud mining, HashFlare
23 represented to users that they could earn funds by recruiting others to purchase HashFlare
24 contracts. HashFlare advertised a referral program, informing users that "as a referrer,
25 you are eligible to receive 10% referral commission bonus for every purchase made by
26 any of your referrals, excluding reinvest and balance purchases."

27

28.    ***HashFlare's Sales of Hashrate:*** I have reviewed internal HashFlare business records reflecting the company's sales and revenues. The records reflect that HashFlare collected over $575 million from customers for the sale of hashrate between 2015 and 2019.

29.    I have also reviewed financial records obtained from banks and other financial institutions. While I have not yet received records for all HashFlare's accounts, the records I have reviewed are generally consistent with the internal HashFlare records referenced above. For example, according to financial records obtained from the United Kingdom, victims sent at least $150 million to an account held by HashFlare at a financial institution known as Connectum. Examples of descriptions accompanying the transfer of money were: "HashFlare.io Invoice…"; "CLOUD MINING INVESTMENT"; and "…Hashflare BTC Mining").

30.    Similarly, bank records obtained from Latvia reflect those victims sent at least $34 million to an account held by HashFlare at Latvijas Pasta Banka. These transfers were made in the names of various individuals, and often referenced the terms "Hashrate Purchase #."

31.    The amounts deposited by victims into the accounts described in Paragraphs 29-30 are each within about 5% of the amounts shown as paid by victims into those accounts on the internal records.

### d.  Termination of HashFlare's Operations

32.    Over the course of its lifespan, HashFlare changed its operations in ways that made it more difficult for customers to withdraw their balances. For example, in or around July 2018, HashFlare required all users to submit "Know Your Customer" identification before they could continue using services offered on the platform. In effect, these additional procedures reduced the ability of users to withdraw funds earned through mining. On online forums, users complained that, even after they submitted the necessary

documentation, HashFlare was taking weeks or months to verify their identities and pay balances. Other users complained that they never received their requested balances.

33.    On July 20, 2018, HashFlare announced that bitcoin mining had been unprofitable for 28 days as of July 18, 2018, and that, per clause 5.5 of its Terms of Service, all bitcoin mining contracts were suspended. According to its terms of service, HashFlare informed investors that it would stop cryptocurrency mining "if the Maintenance and Electricity Fees [are] larger than the Payout." Specifically, according to HashFlare's terms, "If mining remains unprofitable for 21 consecutive days the Service is permanently terminated . . . [and] Payouts and Fees will also be temporarily stopped."

34.    I have interviewed HashFlare investors who reported they were unable to withdraw their balances after HashFlare suspended their bitcoin mining contracts. I later learned that some victims received withdrawals after HashFlare shuttered its operations, but it was sometimes a drawn out and difficult process.

35.    After HashFlare suspended its contracts, investors, including those located in the United States, began identifying red flags that led them to believe HashFlare was a Ponzi scheme and not actually engaged in cryptocurrency mining as represented. Instead, the investors believed that HashFlare was profiting on fluctuations in cryptocurrency exchange rates, using those gains and new investment proceeds to repay earlier investors. For example, investors reported that they visited HashFlare's business address in Estonia, and found that it did not appear to house a server farm or computing equipment consistent with cryptocurrency mining. Additionally, according to these investors, the rates charged by HashFlare for maintenance and electricity were above market average, and pools that were used to mine did not produce the expected output.

36.    HashFlare and HashCoins have stopped selling any mining contracts. As described below, its founders and employees appear to have moved to successor companies that continue to operate in the cryptocurrency space.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**e.  Investigation of HashFlare's and HashCoins' Cloud Mining Equipment**

37.      The FBI has investigated investors' allegations that HashFlare was not actually engaged in cryptocurrency mining as represented to investors. As noted above, HashFlare's business records reflect that it sold approximately $575 million worth of hashrate to customers between 2015 and 2019. Based on HashFlare's internal sales data, HashFlare agreed to provide customers with about 3,313.81 petahertz per second (PH/s) of bitcoin mining hashrate for the period March 2015 through about June 2019. Similarly, HashFlare's internal records show that the company contracted to provide about 9,175 gigahertz per second (GH/s) of hashrate for other types of cryptocurrencies such as ether, Litecoin, Dash, and Zcash. Part of the FBI's investigation involved determining whether HashFlare's mining equipment was sufficient to generate these amounts of hashrate.

38.      As part of this analysis, I investigated what mining equipment was actually owned by HashFlare and its affiliates. During my review of HashFlare's business records, I located an Excel file stored in a HashFlare employee's Google Account. The Excel file contained a tab titled "Acquired Equipment," which appeared to be an inventory of mining equipment acquired by Burfa Media and HashCoins, two companies owned by the defendants. The tab included data regarding the type of equipment purchased, the approximate time of its purchase, the amount of mining power it could generate, and the cost of the equipment. The time span of the equipment inventory was from 2015 through at least December of 2017.

39.      In April 2023, I interviewed the former HashFlare employee who compiled the equipment list. The employee verified that the Acquired Equipment list was indeed an accurate and complete inventory of HashFlare's mining equipment, and that he compiled the list using information given to him by the defendants. The former employee also confirmed that HashFlare did not have mining capacity sufficient to service the contracts it sold.

40.    To further confirm that the Acquired Equipment tab was a complete list of mining equipment owned by defendants' companies, I compared the data in the Acquired Equipment tab with other business records, such as e-mail communications by and between HashFlare personnel and bank statements. For example, I searched these business records for invoices reflecting the purchase of mining equipment by defendants' companies. Based on this comparison, I found that the Acquired Equipment tab appeared to be a complete listing of the mining equipment owned by defendants' companies.

41.    Using the inventory list, I then calculated the total amount of hashrate that could be generated by the equipment owned by defendants' companies, assuming that the equipment was run 24 hours per day, 365 days per year. I performed this analysis separately for Bitcoin mining contracts and mining contracts for alternative cryptocurrencies, which are known as "altcoins."

42.    With respect to Bitcoin mining, I approximated that the Bitcoin mining equipment owned by the defendants could be expected to generate a total of 15.42 PH/s, or 0.5% of the 3,313.81 PH/s sold by HashFlare, for the period August 2017 through November 2019. In other words, and put simply, the defendants did not own enough equipment to service even 1% of their Bitcoin mining contracts.

43.    With respect to altcoin mining, I approximated that, under the favorable assumptions set out above, defendants' mining equipment could be expected to generate 237.80 gigahertz per second of hashrate for the period February 2015 through March 2019. Over this period, HashFlare sold contracts to provide 8,938 gigahertz per second of hashrate. Based on this analysis, defendants owned mining equipment sufficient to service only about 2.5% of the hashrate that HashFlare sold.

**f.  Sham Lease Agreements**

44.    I learned that defendants appeared to have entered into contracts with other companies to provide mining capacity. However, on further investigation, I determined

1   that many of the contracts were sham contracts with shell entities secretly controlled by

2   defendants that did not involve the actual provision of any mining capacity, but instead

3   served as vehicles to funnel fraud proceeds to the defendants. During interviews with law

4   enforcement, Tatjana Potapova, CFO of the defendants' companies, admitted to assisting

5   with the creation of sham lease agreements and corresponding sham invoices.

6       45.    ***Ecohouse:*** Financial records show that, between July 24, 2015, and

7   January 19, 2017, HashCoins transferred about €1,395,000 to the bank account of a

8   company known as Ecohouse. The description of the payments on the bank statements

9   consistently used the language "COMPUTATIONAL POWER LEASING

10  AGREEMENT," an apparent reference to cloud mining.

11      46.    Registration documents for Ecohouse show that the company's partners are

12  two other shell companies, both domiciled in the Marshall Islands. An individual signing

13  as an Ecohouse representative signed a document giving Turõgin a power of attorney.

14  Turõgin opened at least eight bank accounts in the name of Ecohouse at European

15  financial institutions. About €1,290,000 (88 percent of total outflows) was then

16  transferred from Ecohouse into a Burfa Media bank account. An additional €59,500 (4

17  percent of total outflows) was transferred from Ecohouse into Turõgin's personal bank

18  account. Therefore, it appears that Ecohouse was a shell company controlled by the

19  defendants.

20      47.    I have obtained and reviewed some of Ecohouse's bank records. The

21  records show no expenditures that would suggest Ecohouse was actually in the business

22  of cloud mining or otherwise renting computational power.

23      48.    ***Dalmeron:*** Financial records show that HashFlare transferred

24  approximately $109 million in victim funds to a company known as Dalmeron between

25  May 2017 and December 2019. When financial institutions inquired about these

26  transactions, defendants reported that the transfers were being made pursuant to a

27

"Computational Power Rent Agreement" between HashCoins and Dalmeron. Defendants portrayed Dalmeron as a third-party entity unrelated to them or their businesses. For example, when one financial institution asked Potapenko for information about the location of Dalmeron's equipment, Potapenko responded that Dalmeron's management had refused to provide that information to him.

49.    However, my investigation established that the defendants are the true beneficial owners of Dalmeron. First, on October 14, 2016, e-mail records show that Turõgin emailed an incorporation company requesting to purchase Dalmeron Projects, LP. Second, I have reviewed a document dated March 22, 2017 granting a Power of Attorney over Dalmeron in favor of Turõgin. Additionally, email records show that, on October 26, 2017, GoDaddy sent Potapenko an email receipt for the domain registration renewal of the website dalmeron.com. And, finally, Turõgin's email account, turygin@gmail.com, is linked by cookies to dalmeronprojects@gmail.com. Accordingly, based on my training and experience, and information gained during the course of this investigation, I believe that DALMERON is controlled by Turõgin and Potapenko, and is not an independent party as represented by the defendants.

50.    I reviewed Dalmeron's bank records for evidence that the business was engaged in actual mining activity. Specifically, I looked for records showing that Dalmeron had purchased mining equipment or had paid maintenance or electricity costs, which tend to be very significant for any ongoing mining operation. The financial records show no evidence that Dalmeron engaged in any mining operations. Instead, the funds that HashFlare transferred to Dalmeron were simply funneled, through a series of transactions, to the Burfa Entities or other accounts under the defendants' control. Between about May 2017 through July 2020, Dalmeron transferred approximately $100 million to companies owned and controlled by the defendants.

Affidavit of Special Agent Andrew Cropcho-16
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

51.     I participated in two interviews with Potapova (defendants' CFO) in which she explained that Dalmeron was a shell company controlled by the defendants to avoid paying Estonian taxes. Potapova further explained that she did not believe Dalmeron ever provided any actual service to HashFlare. Potapova also admitted to creating documents for banks involving transactions between Dalmeron and Burfa Media to help satisfy inquiries being made by banks. Potapova said the numbers on certain documents came from "out of the blue."  Potapova stated that other employees also helped with Dalmeron-related matters, so she did not know all of the facts regarding Dalmeron.

### g.  Review of Source of Payments to Investors

52.     In addition to investigating HashFlare's and HashCoins' cloud mining capabilities, the FBI also investigated the manner in which these entities paid the subset of investors who did receive some returns. Specifically, the FBI investigated whether defendants' entities were paying investors using currency mined by defendants' entities (which would be evidence of legitimate mining activity), or instead, whether they paid investors with cryptocurrency they had purchased (which would be evidence of a Ponzi scheme).

53.     To perform this analysis, the FBI examined the blockchain to determine the source of the specific units of cryptocurrency used to pay investors. FBI investigators examined all of the deposits into the main wallet used by HashFlare to source investor withdrawal payments, and the analysis determined that only about 3% of the cryptocurrency paid to victims had been mined by HashFlare or HashFlare-affiliated companies. Over 90% of the currency used to pay investors had been purchased or received from virtual asset service providers on the open market. It was not possible to determine the origin of the remaining 7%. This was generally consistent with my conclusion, described above, that HashFlare only owned equipment sufficient to service between about 0.5% and 2.5% of the contracts it sold.

Affidavit of Special Agent Andrew Cropcho-17
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

54.     The investigation found that the vast majority of payments made to customers were derived from a pool of victim deposits, which Turõgin, Potapenko, and others funneled through a series of hosted and private cryptocurrency wallets designed to make it appear as though victims who received payments were actually sharing in mining revenues, as opposed to simply receiving a portion of newer victims' deposits. Turõgin and Potapenko employed a "peel chain"—a technique that I know is sometimes used to launder cryptocurrency by, in essence, converting one large transaction into many smaller transactions that are unlikely to attract notice. In a peel chain, a small portion of the overall amount to be transferred "peels" off from the main address in a relatively low-value transfer. (In this case, Turõgin and Potapenko would, for instance, "peel" off chunks of 10 bitcoin for transfer into a larger cluster.) The remaining balance of the larger cryptocurrency amount transfers to a new address, and the process repeats itself until the desired larger transfer is complete.

55.     Turõgin and Potapenko's use of a peel chain here appears to have been designed to prevent or disrupt victims from tracing payments they received from HashFlare back to the wallets that had received the initial victim deposits.

56.     Estonian authorities independently analyzed HashFlare's cryptocurrency transactions, including 22,935 transfer chains related to HashFlare payout wallets, to determine if payouts to investors were coming from mining pools, which would be the expected source of payouts if HashFlare operated a legitimate mining operation. They reached similar conclusions as those reached by the FBI. Based on their analyses, Estonian authorities concluded that most of the payouts to victims came from the wallets where Bitcoin deposits were received, and only about 0.8% of payouts came from mining pools.

57.     Based on the foregoing, my investigation established that HashFlare was not engaged in substantial cryptocurrency mining, as advertised. Instead, HashFlare

Affidavit of Special Agent Andrew Cropcho-18
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

appears to have operated as a Ponzi scheme by converting victims' deposits from fiat to cryptocurrency, or from one cryptocurrency to another, in order to pay back other victims and to conceal the true source of those payments.

**C. Defendants' Fraudulent use of Polybius ICO Proceeds**

58.      In addition to HashCoins, HashFlare, and the Burfa Entities, Turõgin and Potapenko also formed a second conglomerate, comprised of at least six entities— Polybius Foundation, Digital Ledger, Polybius Tech, Polybius Ventures, Polybius Fintech, and Polybius Fintech MidCo (collectively, referred to as "Polybius").

59.      In approximately April 2017, the defendants began soliciting investments in an initial coin offering (ICO) to fund the Polybius Foundation. An email advertising the launch of the "Polybius project" indicated that the "HashCoins team would like to invite you to join our latest project Polybius for which we are launching crowdfunding on May 31!" Other emails promoting Polybius were sent signed by the HashFlare team and/or by Turõgin.

60.      In support of the ICO, the defendants created a prospectus explaining the terms of their offering and distributed it to HashFlare investors, through Twitter and other channels. The Prospectus described Polybius as "a team of financial, security, legal and technical experts." The Prospectus stated that Polybius Bank would be a "fully digital bank accessible everywhere at any time. It will have all the functions of a classical bank, but will not host any branches, nor any physical front-offices and will rely fully on the latest digital technologies." The front of the prospectus reads, in part: "Polybius POWERED BY HashCoins."

61.      The prospectus explained that investors would receive Polybius "tokens." According to the prospectus, "a Polybius token represents the right to receive a part of the distributable profits of . . . Polybius Bank." The prospectus stated that the investment proceeds would be used "to support the establishment of the Polybius Bank," and that the

"funds raised by the sale of tokens will be retained by the Polybius Foundation until they will be used." In other words, the prospectus represented that funds raised in the ICO would be used only for Polybius business purposes, and a share of Polybius profits would be distributed to investors.

62.     According to internal records maintained by representatives of Polybius, the ICO raised approximately $25 million from outside investors during the summer of 2017. On or around June 13, 2017, Turõgin, Potapenko, and others caused an article to be published on the PRNewswire with the subheading: "Polybius cryptobank ICO has raised over $6 million in under three days, meeting the requirements to receive a European banking license."

63.     Following the completion of the ICO, Polybius announced that it would not be opening a bank, and that it would develop a mobile application instead. Polybius never formed a bank and never distributed any profits to tokenholders.

64.     Contrary to their representations that ICO proceeds would be retained by the Polybius Foundation until used for its operations, defendants transferred a large portion of the ICO proceeds out of Polybius to be used for their own benefit. Based on a review of the blockchain and records provided by BlockFi, between around May 19, 2021 and June 18, 2022, Polybius transferred 2,060 bitcoin that it initially received during its ICO—funds to be used to establish a digital bank—to Burfa Media's BlockFi account. Burfa Media subsequently collateralized the Polybius ICO bitcoin to take out loans in order to buy at least $13 million of mining equipment. Instead of being used to benefit former HashFlare investors or Polybius ICO participants, the mining equipment was used to personally benefit Turõgin and Potapenko.

D.     **Use of Interstate Wires**

65.     My investigation has established that the defendants used, and caused to be used, the interstate and foreign wires in various ways in furtherance of their scheme to

Affidavit of Special Agent Andrew Cropcho-20
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

defraud. For example, I have reviewed emails that HashFlare sent customers containing invoices for the purchase of hashrate to victims in the Western District of Washington via interstate and foreign wire transmissions. Similarly, I have reviewed bank records showing that investors funded their purchases of hashrate from HashFlare by means of interstate and foreign wire transmissions, including transmissions originating in the Western District of Washington and terminating outside of Washington.

**E.     Role of Tatjana Potapova**

66.     Potapova was hired as the CFO of the Burfa Entities in 2016, and she led an accounting department comprised of up to four people. I reviewed the contents of Potapova's e-mail account "tatjana@burfa.com," and observed many instances in which she provided invoices and contracts relating to HashFlare LP, HashCoins OÜ, Burfa Media OÜ, and Dalmeron, which she later confirmed contained false information during interviews with law enforcement.

**F.     Estonian Searches**

67.     I have reviewed reports written by the Estonian authorities documenting the Estonian Searches. Based on those reports, I understand that the Estonian authorities seized items that that they believed, and that in fact, constituted or contained evidence of the crimes being investigated at each of the locations at which they seized the devices imaged on the ten Seagate hard drives listed in Attachment A.

68.     From my investigation, I also know that defendants and their employees used computers, cellular telephones, and other digital devices, throughout in their business activity, at both HashFlare and Polybius, including to send emails, interact with banks, conduct blockchain transactions, interact with employees, and monitor the operations of HashFlare.

69.     At Turõgin's residence, located at Kuusenõmme tee 19, Pirita linnaosa, Tallinn, Estonia, Estonian authorities reported finding the following, among other things:

- Agreements involving Dalmeron Projects, a shell company utilized by Turõgin to launder fraud proceeds, and agreements involving Burfa Media;
- Banking materials relating to Burfa Tech, Burfa Media, and Ivan Turõgin;
- Turõgin's iPhone 13 Pro.[1] Evidence collected and reviewed throughout this investigation has shown that Turõgin utilized his iPhone to exchange text messages and e-mails about his business and financial dealings; and
- The other computing devices and external hard drives listed in Appendix 1 to Attachment A shown with the location "Turogin."

70.     At Potapenko's residence, located at Järvemetsa tee 5, Peetri, Estonia, the Estonian authorities reported finding the following, among other things:

- Virtual currency cold storage wallets;
- Potapenko's iPhone 14 Pro[2] and iPhone 12 Mini. Evidence collected and reviewed throughout this investigation has shown that Potapenko utilized his iPhone to exchange text messages and e-mails about his business and financial dealings; and
- The other computing devices and external hard drives listed in Appendix 1 to Attachment A shown with the location "Potapenko."

71.     At Potapova's residence, located at Rahu 18, Loksa, Estonia, the Estonian authorities reported finding the following, among other things:

---

[1] A search warrant was previously issued for this iPhone 13 Pro, but law enforcement has yet to access its contents due to its encryption settings.
[2] A search warrant was previously issued for this iPhone 14 Pro, but law enforcement has yet to access its contents due to technological issues related to its size.

Affidavit of Special Agent Andrew Cropcho-22
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Business records relating to defendant's businesses, including a contract involving HashCoins;
- A Dell laptop, with the contents from the account tatjana@burfa.com on it; and
- The other computing devices and external hard drives listed in Appendix 1 to Attachment A shown with the location "Potapova;"

I know from my investigation that the use of computers was an integral part of Potapova's role in the defendants' businesses, and that Potapova used them for multiple purposes, including to send emails, interact with banks, create fraudulent invoices, interact with Potapenko and Turõgin, and record financial transactions.

72.    I know from my investigation that the defendants have operated their businesses at several locations, evidence of which was available through public sources, bank statements, lease agreements, and mining equipment shipment information. Those locations were the same locations searched during the Estonian Searches list in Paragraph 6.d - 6.f.

73.    Since at least 2017, Tartu mnt 83, Tallinn, Estonia has been the publicly registered location of the defendants' holding company, Burfa Capital, as well as most of its subsidiaries, including Burfa Tech, Burfa Media, and Burfa Real Estate. This was also an address used on invoices and bank statement applications for the defendants and their companies.

74.    Although HashFlare and Dalmeron did not use Tartu mnt 83 as their address, because they existed as shell companies in other jurisdictions, since the defendants ultimately controlled both entities and utilized Tartu mnt 83 as the office space for their other companies, I have probable cause to believe that records for HashFlare and Dalmeron also were stored at that location.

Affidavit of Special Agent Andrew Cropcho-23
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

75. At Tartu mnt 83, Tallinn, Estonia, the Estonian authorities reported finding the following, among other things:

- Numerous virtual currency cold storage wallets;
- Bank cards and records in the name of Burfa Media, Burfa Tech, Dalmeron Projects, Ivan Turõgin, and Sergei Potapenko;
- Folders with documents inside of them, relating to entities such as Burfa Media, Burfa Tech, HashCoins, Polybius Foundation, and Polybius Tech;
- USB device[3] with the name "Hash Flare" on it, determined during the inventory process to consist of about 1.26GB of data; and
- The other computing devices and external hard drives listed in Appendix 1 to Attachment A shown with the location "Tartu Mnt 83."

76. At the property leased by Burfa Media OÜ at Varvi tn 5 (Laki tn 12), Tallinn, Estonia, the Estonian authorities reported finding the following, among other things:

- Virtual currency miners that match the brand and model of virtual currency miners that were purchased by the defendants using funds from the Polybius ICO;
- A virtual currency miner with the name "HashCoins" on it;
- Hard drives and multiple computers that may have been used to operate or store data relating to the virtual currency miners, including records regarding where the miners would deposit any virtual currencies that were mined; and

---

[3] A search warrant was previously issued for this USB device, but law enforcement has yet to access its contents due to technological issues related to its formatting.

Affidavit of Special Agent Andrew Cropcho-24
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          • The other computing devices and external hard drives listed in

2            Appendix 1 to Attachment A shown with the location "Laki 12."

3      77.    At the property leased by Burfa Tech OÜ at Narva Technology Park,

4  Elektrijaama tee 59, Narva, Estonia, the Estonian authorities reported finding the

5  following, among other things:

6          • Virtual currency miners that match the brand and model of virtual

7            currency miners that were purchased using funds from the Polybius

8            ICO;

9          • Hard drives and multiple computers that may have been used to operate

10           or store data relating to the virtual currency miners, including records

11           regarding where the miners would deposit any virtual currencies that

12           were mined; and

13         • The other computing devices and external hard drives listed in

14           Appendix 1 to Attachment A shown with the location "Narva."

15     78.    As noted above, evidence developed throughout this investigation shows

16  that the defendants used their digital devices to communicate about their fraudulent

17  business activities, including the HashFlare and Polybius frauds and their money

18  laundering conspiracy. Further, I know from my training and experience that criminals

19  engaged in complex financial crimes frequently maintain evidence relating to those

20  activities on their electronic devices. And, I know that information on one digital device

21  can easily be copied to another digital device and that criminals frequently transfer and

22  copy information between different digital devices.

23     79.    Based on the above, I have probable cause to believe that the contents of

24  the digital devices identified in Attachment A will contain evidence of the crimes being

25  investigated.

26

27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**G.      Forensic Evidence**

80.      This application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how digital devices or other electronic storage media were used, the purpose of their use, who used them, and when.

81.      Stored data can provide evidence of a file that was once on the digital device or other electronic storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the digital device or other electronic storage media that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the history of connections to other computers, the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device or other electronic storage media was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

82.      Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner and/or others with direct physical access to the computer. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log:  computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

83.     A person with appropriate familiarity with how a digital device or other electronic storage media works can, after examining this forensic evidence in its proper context, draw conclusions about how the digital device or other electronic storage media were used, the purpose of their use, who used them, and when

84.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device or other electronic storage media that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

//

//

//

Affidavit of Special Agent Andrew Cropcho-28
USAO#2019R01037

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CONCLUSION

85.    Based on the foregoing, I respectfully request that the Court issue the proposed search warrant. Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the devices specified in Attachment A (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents, and records identified in Attachment B.


ANDREW CROPCHO, AFFIANT
Special Agent


The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit on September 19th, 2024.


THE HONORABLE BRIAN A. TSUCHIDA
United States Magistrate Judge

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**ATTACHMENT A**

Devices to be Searched

The government is authorized to search the following forensic copies of devices in the custody of the Federal Bureau of Investigation in Seattle, Washington, for the material identified in Attachment B:

1.    Ten Seagate Hard Drives, which contain images of digital devices seized during searches in Estonian more specifically identified in Appendix 1 to this Attachment.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

APPENDIX 1

| Device # | Name | Location | Type | Path |
|---|---|---|---|---|
| 1 | 0280418_Dell | Laki 12 | Dell | D:\_DIG-12235_Laki12_VarviS\A134_ruum\0280418_Dell |
| 2 | 1845052_SanDisk_USB | Laki 12 | SanDisk USB | D:\_DIG-12235_Laki12_VarviS\A134_ruum\1845052_SanDisk_USB |
| 3 | 1845053_USB | Laki 12 | USB | D:\_DIG-12235_Laki12_VarviS\A134_ruum\1845053_USB |
| 4 | 1845054_USB_AP8G | Laki 12 | USB | D:\_DIG-12235_Laki12_VarviS\A134_ruum\1845054_USB_AP8G |
| 5 | 2186668_mac_mini | Laki 12 | mac mini | D:\_DIG-12235_Laki12_VarviS\A134_ruum\2186668_mac_mini |
| 6 | 6242159_Asus | Laki 12 | Asus | D:\_DIG-12235_Laki12_VarviS\A134_ruum\6242159_Asus |
| 7 | J13-0366666 Cloudkey GEN2 | Laki 12 | 0366666 Cloudkey GEN2 | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366666 Cloudkey GEN2 |
| 8 | J13-0366666_Hikvision | Laki 12 | Hikvision | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366666_Hikvision |
| 9 | J13-0366666_Hikvision | Laki 12 | Hikvision | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366666_Hikvision |
| 10 | WD40PURZ-85TTDY0_Teine ketas | Laki 12 | Discs | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366666_Hikvision\WD40PURZ-85TTDY0_Teine ketas |
| 11 | WD-WCC7K7DPSNT5_WD40PURZ-85TTDY0 | Laki 12 | Hikvision Drive | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366666_Hikvision\WD-WCC7K7DPSNT5_WD40PURZ-85TTDY0 |
| 12 | J13-0366668_microSD_Kingston | Laki 12 | microSD Kingston | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366668_microSD_Kingston |
| 13 | J13-0366669_HDD | Laki 12 | Seagate HD | D:\_DIG-12235_Laki12_VarviS\A134_ruum\J13-0366669_HDD |
| 14 | 6241179_macbook | Narva | macbook | D:\_DIG-12243_Narva Elektrijaama tee 59D\6241179_macbook |
| 15 | 668989_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\668989_Kingston_USB |
| 16 | 669016_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669016_Kingston_USB |
| 17 | 669017_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669017_Kingston_USB |
| 18 | 669018_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669018_Kingston_USB |
| 19 | 669019_DataTraveler 3.0 | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669019_DataTraveler 3.0 |
| 20 | 669020_SanDisk_microSD | Narva | SanDisk Micro SD | D:\_DIG-12243_Narva Elektrijaama tee 59D\669020_SanDisk_microSD |
| 21 | 669021_SanDisk_microSD | Narva | SanDisk Micro SD | D:\_DIG-12243_Narva Elektrijaama tee 59D\669021_SanDisk_microSD |
| 22 | 669022_SanDisk_microSD | Narva | SanDisk Micro SD | D:\_DIG-12243_Narva Elektrijaama tee 59D\669022_SanDisk_microSD |
| 23 | 669023_Sony_USB | Narva | Sony USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669023_Sony_USB |
| 24 | 669024_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669024_Kingston_USB |
| 25 | 669025_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669025_Kingston_USB |
| 26 | 669026_USB SP DISK 3.0 | Narva | USB SP DISK 3.0 | D:\_DIG-12243_Narva Elektrijaama tee 59D\669026_USB SP DISK 3.0 |
| 27 | 669042_M2 SSD | Narva | M2 SSD | D:\_DIG-12243_Narva Elektrijaama tee 59D\669042_M2 SSD |
| 28 | 669043_M2 SSD | Narva | M2 SSD | D:\_DIG-12243_Narva Elektrijaama tee 59D\669043_M2 SSD |
| 29 | 669044_M2 SSD | Narva | M2 SSD | D:\_DIG-12243_Narva Elektrijaama tee 59D\669044_M2 SSD |
| 30 | 669045_Kingston_USB | Narva | Kingston USB | D:\_DIG-12243_Narva Elektrijaama tee 59D\669045_Kingston_USB |
| 31 | Dell EMC PowerEdge T340 | Narva | Dell EMC PowerEdge T340 | D:\_DIG-12243_Narva Elektrijaama tee 59D\Dell EMC PowerEdge T340 |
| 32 | Dell Server PowerEdge 630 | Narva | Dell Server PowerEdge 630 | D:\_DIG-12243_Narva Elektrijaama tee 59D\Dell Server PowerEdge 630 |
| 33 | Dell Server PowerEdge R540 | Narva | Dell Server PowerEdge R540 | D:\_DIG-12243_Narva Elektrijaama tee 59D\Dell Server PowerEdge R540 |
| 34 | DVR Hickvision | Narva | DVR Hickvision | D:\_DIG-12243_Narva Elektrijaama tee 59D\DVR Hickvision |
| 35 | Ruum 1_6240874_Lauaarvuti Dell SR00008 | Narva | Lauaarvuti Dell SR00008 | D:\_DIG-12243_Narva Elektrijaama tee 59D\Ruum 1_6240874_Lauaarvuti Dell SR00008 |
| 36 | Ruum 5_2133332_Asus SÜklearvuti RTL8821CE | Narva | Asus | D:\_DIG-12243_Narva Elektrijaama tee 59D\Ruum 5_2133332_Asus SÜklearvuti RTL8821CE |
| 37 | Synology Server DS920 | Narva | Synology Server DS920 | D:\_DIG-12243_Narva Elektrijaama tee 59D\Synology Server DS920 |
| 38 | Synology Server RS1619xs+_SR00005 | Narva | Synology Server RS1619xs+ | D:\_DIG-12243_Narva Elektrijaama tee 59D\Synology Server RS1619xs+_SR00005 |
| 39 | Synology Server RS1619XS+_SR00006 | Narva | Synology Server RS1619XS+ | D:\_Dig-12243_Narva Elektrijaama tee 59D\Synology Server RS1619XS+_SR00006 |
| 40 | s.potapenko_1520000_2TB | Potapenko | 2TB | D:\S.Potapenko\s.potapenko_1520000_2TB |

APPENDIX 1

| Device # | Name | Location | Type | Path |
|---|---|---|---|---|
| 41 | s.potapenko_1917232_USB | Potapenko | USB | D:\S.Potapenko\s.potapenko_1917232_USB |
| 42 | s.potapenko_1917233_2TB | Potapenko | 2TB | D:\S.Potapenko\s.potapenko_1917233_2TB |
| 43 | s.potapenko_1917319_USB | Potapenko | USB | D:\S.Potapenko\s.potapenko_1917319_USB |
| 44 | s.potapenko_1917321-2xUSB | Potapenko | 1917321-2xUSB | D:\S.Potapenko\s.potapenko_1917321-2xUSB |
| 45 | s.potapenko_1917322_1TB | Potapenko | 1TB Drive | D:\S.Potapenko\s.potapenko_1917322_1TB |
| 46 | s.potapenko_5836152_macbookair | Potapenko | macbookair | D:\S.Potapenko\s.potapenko_5836152_macbookair |
| 47 | s.potapenko_6242215_macbookpro | Potapenko | macbookpro | D:\S.Potapenko\s.potapenko_6242215_macbookpro |
| 48 | S.Potapenko_G240616_iPad | Potapenko | iPad | D:\S.Potapenko\S.Potapenko_G240616_iPad |
| 49 | DELL | Potapova | DELL | D:\T.Potapova\T.Potapova LO PAPA\DELL |
| 50 | HP | Potapova | HP | D:\T.Potapova\T.Potapova LO PAPA\HP |
| 51 | LO fotod | Potapova | Photos | D:\T.Potapova\T.Potapova LO PAPA\LO fotod |
| 52 | T.Potapova_0322308_HP Probook | Potapova | HP Probook | D:\T.Potapova\T.Potapova_0322308_HP Probook |
| 53 | T.Potapova_1845057_Huawei | Potapova | Huawei | D:\T.Potapova\T.Potapova_1845057_Huawei |
| 54 | T.Potapova_1845061_iPhone 13 Pro Max | Potapova | iPhone 13 Pro Max | D:\T.Potapova\T.Potapova_1845061_iPhone 13 Pro Max |
| 55 | T.Potapova_6241854_Dell | Potapova | Dell | D:\T.Potapova\T.Potapova_6241854_Dell |
| 56 | T.Potapova-Cloud | Potapova | Cloud | D:\T.Potapova\T.Potapova-Cloud |
| 57 | _1915619-hdd_2tb | Tartu Mnt 83 | Toshiba hd | D:\_DIG-12166_Tartu-mnt\_1915619-hdd_2tb |
| 58 | 0001808251_Synology DS1517 | Tartu Mnt 83 | Synology DS1517 | D:\_DIG-12166_Tartu-mnt\0001808251_Synology DS1517 |
| 59 | 0001808252_Dell Serverarvuti_EMC PowereEdge | Tartu Mnt 83 | Dell Serverarvuti EMC PowereEdge | D:\_DIG-12166_Tartu-mnt\0001808252_Dell Serverarvuti_EMC PowereEdge |
| 60 | 1915616-3xKetas | Tartu Mnt 83 | 3 Hard Drives | D:\_DIG-12166_Tartu-mnt\1915616-3xKetas |
| 61 | 1915617_6USB | Tartu Mnt 83 | 6 USBs | D:\_DIG-12166_Tartu-mnt\1915617_6USB |
| 62 | 1915618-1TB-HDD | Tartu Mnt 83 | 1TB HDD | D:\_DIG-12166_Tartu-mnt\1915618-1TB-HDD |
| 63 | 1915620-4xketas | Tartu Mnt 83 | 4xdiscs | D:\_DIG-12166_Tartu-mnt\1915620-4xketas |
| 64 | 1915621_2USB | Tartu Mnt 83 | USB bitcoin miner | D:\_DIG-12166_Tartu-mnt\1915621_2USB |
| 65 | 1915623_4USB | Tartu Mnt 83 | USB | D:\_DIG-12166_Tartu-mnt\1915623_4USB |
| 66 | 1917276_iPhone | Tartu Mnt 83 | iPhone | D:\_DIG-12166_Tartu-mnt\1917276_iPhone |
| 67 | 2133390_macbook_pro | Tartu Mnt 83 | macbook pro | D:\_DIG-12166_Tartu-mnt\2133390_macbook_pro |
| 68 | 2133391_macbook_pro_Potapenko | Tartu Mnt 83 | macbook | D:\_DIG-12166_Tartu-mnt\2133391_macbook_pro_Potapenko |
| 69 | 2133393_mac_mini | Tartu Mnt 83 | mac mini | D:\_DIG-12166_Tartu-mnt\2133393_mac_mini |
| 70 | A463558_iMac | Tartu Mnt 83 | iMac | D:\_DIG-12166_Tartu-mnt\A463558_iMac |
| 71 | G15-0436454_USB | Tartu Mnt 83 | USB | D:\_DIG-12166_Tartu-mnt\G15-0436454_USB |
| 72 | G240578_iPhone14Pro | Tartu Mnt 83 | iPhone14Pro | D:\_DIG-12166_Tartu-mnt\G240578_iPhone14Pro |
| 73 | G240584_Samsung_SSD_1TB | Tartu Mnt 83 | Samsung SSD | D:\_DIG-12166_Tartu-mnt\G240584_Samsung_SSD_1TB |
| 74 | G240617_SamsungSSD_1TB | Tartu Mnt 83 | SamsungSSD | D:\_DIG-12166_Tartu-mnt\G240617_SamsungSSD_1TB |
| 75 | G240618_500GB | Tartu Mnt 83 | Toshiba HD | D:\_DIG-12166_Tartu-mnt\G240618_500GB |
| 76 | G240619_1TB | Tartu Mnt 83 | Ledger? | D:\_DIG-12166_Tartu-mnt\G240619_1TB |
| 77 | G240620_4ese_ja_visiitkardid | Tartu Mnt 83 | Chieftec External Storage | D:\_DIG-12166_Tartu-mnt\G240620_4ese_ja_visiitkardid |
| 78 | G240621_Ledger_ja_2xSD | Tartu Mnt 83 | Ledger and USB | D:\_DIG-12166_Tartu-mnt\G240621_Ledger_ja_2xSD |
| 79 | G240622_2TB | Tartu Mnt 83 | Western Digital 2TB | D:\_DIG-12166_Tartu-mnt\G240622_2TB |
| 80 | G240623_iPad | Tartu Mnt 83 | iPad | D:\_DIG-12166_Tartu-mnt\G240623_iPad |

APPENDIX 1

| Device # | Name | Location | Type | Path |
|---|---|---|---|---|
| 81 | G240624_SSD Samsung | Tartu Mnt 83 | SSD Samsung | D:\_DIG-12166_Tartu-mnt\G240624_SSD Samsung |
| 82 | G240625_SamsungSSD_2TB | Tartu Mnt 83 | SamsungSSD | D:\_DIG-12166_Tartu-mnt\G240625_SamsungSSD_2TB |
| 83 | G240628_iPhone14Pro | Tartu Mnt 83 | iPhone14Pro | D:\_DIG-12166_Tartu-mnt\G240628_iPhone14Pro |
| 84 | 014518_iMac | Tartu Mnt 83 | iMac | D:\_DIG-12208_Felmaway\014518_iMac |
| 85 | 014519_iMac | Tartu Mnt 83 | iMac | D:\_DIG-12208_Felmaway\014519_iMac |
| 86 | 014520_iMac Pro | Tartu Mnt 83 | iMac Pro | D:\_DIG-12208_Felmaway\014520_iMac Pro |
| 87 | 0322169-hp | Tartu Mnt 83 | hp | D:\_DIG-12208_Felmaway\0322169-hp |
| 88 | 1518630_USB | Tartu Mnt 83 | USB | D:\_DIG-12208_Felmaway\1518630_USB |
| 89 | 1915595_2xUSB | Tartu Mnt 83 | 2xUSB | D:\_DIG-12208_Felmaway\1915595_2xUSB |
| 90 | 1915597_SonyXperia | Tartu Mnt 83 | SonyXperia | D:\_DIG-12208_Felmaway\1915597_SonyXperia |
| 91 | 1915600_iPhoneSE_punane | Tartu Mnt 83 | iPhoneSE | D:\_DIG-12208_Felmaway\1915600_iPhoneSE_punane |
| 92 | 1915601_Redmi | Tartu Mnt 83 | Redmi | D:\_DIG-12208_Felmaway\1915601_Redmi |
| 93 | 1915602_iPhoneSE | Tartu Mnt 83 | iPhoneSE | D:\_DIG-12208_Felmaway\1915602_iPhoneSE |
| 94 | 1915603_3xcards | Tartu Mnt 83 | 3xcards | D:\_DIG-12208_Felmaway\1915603_3xcards |
| 95 | 1915605_USB_Intenso | Tartu Mnt 83 | Intenso USB | D:\_DIG-12208_Felmaway\1915605_USB_Intenso |
| 96 | 218683_HP Sylearvuti | Tartu Mnt 83 | HP Sylearvuti | D:\_DIG-12208_Felmaway\218683_HP Sylearvuti |
| 97 | 0001808441_LA | Tartu Mnt 83 | Dreamline Tracer Asroc (PC) | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\0001808441_LA |
| 98 | 1519993_myphone | Tartu Mnt 83 | myphone | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\1519993_myphone |
| 99 | 1833619_iPhone | Tartu Mnt 83 | iPhone | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\1833619_iPhone |
| 100 | 1844585_iPhone | Tartu Mnt 83 | iPhone S | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\1844585_iPhone |
| 101 | 1844620_iPhone | Tartu Mnt 83 | iPhone | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\1844620_iPhone |
| 102 | 218820_Lenovo | Tartu Mnt 83 | Lenovo | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\218820_Lenovo |
| 103 | 227002_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227002_macbook_pro |
| 104 | 227003_HP | Tartu Mnt 83 | HP | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227003_HP |
| 105 | 227008_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227008_macbook_pro |
| 106 | 227009_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227009_macbook_pro |
| 107 | 227010_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227010_macbook_pro |
| 108 | 227011_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227011_macbook_pro |
| 109 | 227012_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227012_macbook_pro |
| 110 | 227044_mac-studio | Tartu Mnt 83 | mac-studio | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227044_mac-studio |
| 111 | 227045_mac-studio | Tartu Mnt 83 | mac-studio | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227045_mac-studio |
| 112 | 227046_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227046_macbook_pro |
| 113 | 227047_macbook_pro | Tartu Mnt 83 | macbook | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\227047_macbook_pro |
| 114 | 501-3.2-1_USB | Tartu Mnt 83 | USB | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\501-3.2-1_USB |
| 115 | 501-3.2-2_polybius.io_USB | Tartu Mnt 83 | USB | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\501-3.2-2_polybius.io_USB |
| 116 | 503-2.1_USB | Tartu Mnt 83 | USB | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\503-2.1_USB |
| 117 | 503-2.2_SanDisk USB | Tartu Mnt 83 | SanDisk USB | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\503-2.2_SanDisk_USB |
| 118 | C13-0072030_DELL | Tartu Mnt 83 | DELL | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\C13-0072030_DELL |
| 119 | 91R0A063F1QF | Tartu Mnt 83 | DELL | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\C13-0072030_DELL\91R0A063F1QF |
| 120 | S455NA0N521972 | Tartu Mnt 83 | DELL | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\C13-0072030_DELL\S455NA0N521972 |

APPENDIX 1

| Device # | Name | Location | Type | Path |
|---|---|---|---|---|
| 121 | S455NA0N610317 | Tartu Mnt 83 | DELL | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\C13-0072030_DELL\S455NA0N610317 |
| 122 | S455NA0N610322 | Tartu Mnt 83 | DELL | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\C13-0072030_DELL\S455NA0N610322 |
| 123 | J13-0072029_Server Synology NAS | Tartu Mnt 83 | Server Synology NAS | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\J13-0072029_Server Synology NAS |
| 124 | VRHU0EDK | Tartu Mnt 83 | Server Synology NAS | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\J13-0072029_Server Synology NAS\VRHU0EDK |
| 125 | VRHUAXJK | Tartu Mnt 83 | Server Synology NAS | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\J13-0072029_Server Synology NAS\VRHUAXJK |
| 126 | KT7900425_SSD | Tartu Mnt 83 | SSD | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\KT7900425_SSD |
| 127 | KT7900427_iPhone | Tartu Mnt 83 | iPhone | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\KT7900427_iPhone |
| 128 | KT7900429_Xiaomi | Tartu Mnt 83 | Xiaomi | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\KT7900429_Xiaomi |
| 129 | KT7900430_Huawei LUA-L21 | Tartu Mnt 83 | Huawei LUA-L21 | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\KT7900430_Huawei LUA-L21 |
| 130 | KT7900431_iPhone_SE | Tartu Mnt 83 | iPhone SE | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\KT7900431_iPhone_SE |
| 131 | KT7903736_Xiaomi_Redmi9A | Tartu Mnt 83 | Xiaomi Redmi9A | D:\_DIG-13258_LO_Tartu-mnt_RUUMIST_503\KT7903736_Xiaomi_Redmi9A |
| 132 | D.Lazba-MacBook | Tartu Mnt 83 | MacBook | D:\D.Lazba\D.Lazba-MacBook |
| 133 | I.Turogin-0647967-macbook | Turõgin | macbook | D:\I.Turogin\I.Turogin-0647967-macbook |
| 134 | I.Turogin-1520027-USB_32GB | Turõgin | USB 32GB | D:\I.Turogin\I.Turogin-1520027-USB_32GB |
| 135 | I.Turogin-1520029-USB_4GB | Turõgin | USB 4GB | D:\I.Turogin\I.Turogin-1520029-USB_4GB |
| 136 | I.Turogin-1520069-iPhone-WelcomeScreen | Turõgin | iPhone | D:\I.Turogin\I.Turogin-1520069-iPhone-WelcomeScreen |
| 137 | I.Turogin-1520070_iPhone-WelcomeScreen | Turõgin | iPhone-WelcomeScreen | D:\I.Turogin\I.Turogin-1520070_iPhone-WelcomeScreen |
| 138 | I.Turogin-1917215-WD | Turõgin | WD | D:\I.Turogin\I.Turogin-1917215-WD |
| 139 | I.Turogin-5836161-macbook_Pro | Turõgin | Macbook Pro | D:\I.Turogin\I.Turogin-5836161-macbook_Pro |
| 140 | I.Turogin-5836169-iPad | Turõgin | iPad | D:\I.Turogin\I.Turogin-5836169-iPad |
| 141 | i.turogin-5836171-macbookair | Turõgin | macbookair | D:\I.Turogin\I.turogin-5836171-macbookair |
| 142 | I.Turogin-5836172_iPad | Turõgin | iPad | D:\I.Turogin\I.Turogin-5836172_iPad |
| 143 | I.Turogin-665972_SSD | Turõgin | SSD | D:\I.Turogin\I.Turogin-665972_SSD |

## ATTACHMENT B

### Things to be Seized

From the items listed in Attachment A of this warrant, the government is authorized to search for and seize the following items, which are evidence, instrumentalities, and/or fruits of violations of Title 18, United States Code, Sections, 1349, 1343, and 1956(h) from 2013 through 2022:

1.    All material relating to any of the following business entities:

    a.    Burfa Media OÜ,

    b.    Burfa Capital OÜ (aka Starfix OÜ),

    c.    Burfa Tech OÜ (aka HashCoins OÜ),

    d.    Dalmeron Projects LP,

    e.    Polybius Foundation OÜ (aka Polybius Foundation SE, or Polybius Foundation AS),

    f.    HashFlare LP (aka HashCoins LP, or Fast Consult LP),

    g.    Advendor OÜ,

    h.    Polybius Fintech MidCo OÜ,

    i.    Polybius Tech OÜ,

    j.    Apico OÜ,

    k.    Felmaway OÜ; and

    l.    Ecohouse Networks OÜ, or any related entities;

2.    All material relating to financial transactions involving Ivan Turõgin, Sergei Potapenko;

3.    Financial documents, including, but not limited to, any evidence of the ownership, control or use of bank accounts or cryptocurrency wallets or accounts; wire transmissions and transfers of funds or assets, including cryptocurrency;

4.    Cryptocurrency, cryptocurrency keys and wallets;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5.      Any records or documentation related to the purchase, acquisition, or distribution of cryptocurrency, including keys, passwords, and recovery seed, or seed phrases;

6.      Any records or documentation related to the purchase, sale acquisition, use, or lease of cryptocurrency mining equipment or capacity, including, but not limited to, the recipients or beneficiaries of any proceeds of any mining activity; and

7.      Evidence sufficient to identify co-conspirators of Ivan Turõgin or Sergei Potapenko, including

    a.  Contact lists;

    b.  Telephone call history; and

    c.  Evidence of email or other online accounts, including passwords and account names.

8.      The following digital forensic evidence associated with any devices identified in Appendix 1 to Attachment A:

    a.   Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

    b.  Evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    c.  Evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    d.  Evidence of the lack of such malicious software;

e. Evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

f. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

g. Evidence of the times the digital device or other electronic storage media was used;

h. Stored lists of recent received, sent, and missed calls;

i. Stored contact information;

j. Stored photographs, videos, addresses, calendar notes, notes, map history, or documents/files of or related to the misappropriation of assets from Majestic Glove, or any of its affiliated companies, including any embedded GPS data or other metadata associated with those photographs, videos, and other items;

k. Stored web browsing history;

l. Stored location data, including from any map applications.

**Persons Authorized to Review ESI**

This review of digital evidence may be conducted by any federal or local government personnel, sworn or non-sworn, assisting in the investigation, who may include, in addition to law enforcement officers and agents, federal and local contractors and support staff, attorneys for the government, attorney support staff, and technical experts. Pursuant to the requested warrant, the FBI may deliver a complete copy of the electronic data to the custody and control of attorneys for the government and their support staff for their independent review

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970